**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**1:16-cv-385-FDW**

| | | |
|---|---|---|
| **JIMMY ALLEN ROBERTS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **FRANK L. PERRY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

**THIS MATTER** comes before the Court on Defendants' Motion for Summary Judgment, (Doc. No. 33).

## I.     BACKGROUND

*Pro se* Plaintiff filed this action pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). The Amended Complaint passed initial review, (Doc. Nos. 16, 17), and Plaintiff previously filed a Motion for Summary Judgment that was denied, (Doc. Nos. 26, 27). Defendants have now filed a Motion for Summary Judgment that is before the Court for consideration.

**(1)     Amended Complaint**[1] (Doc. No. 16)

*Pro se* Plaintiff, who is currently incarcerated at the Franklin Correctional Center, filed this action pursuant to 42 U.S.C. § 1983 and RLUIPA for incidents that allegedly occurred at Mountain View Correctional Institution. He names as Defendants the North Carolina Secretary of Prisons

---

[1] Allegations that did not pass initial review are omitted from this section.

Eric Hooks (formerly Frank L. Perry), and the following employees of Mountain View C.I.: Administrator Mike Slagle, Mailroom Supervisor Lynn Ollis, and Correction Officer Grear.

Plaintiff alleges in his verified Amended Complaint that five religious books arrived for him at Mountain View C.I. on June 24, 2016. They were authored by Pastor Everett Ramsey of Faith Baptist Church, and they were published by James Nelson Publishers and/or Pastor Ramsey and satisfied the DPS definition of "published." Defendant Ollis rejected the publications because they did not come from a legitimate publisher or marketer and Plaintiff appealed. On June 26, 2016, Plaintiff sent Defendant Slagle a request form informing him of Ollis' actions but he failed to respond or take any remedial action, which shows deliberate indifference. On July 12, 2016, Plaintiff sent a letter to Perry notifying him of Ollis' actions and he failed to respond or take any remedial action, which shows deliberate indifference. On July 21, 2016, Plaintiff filed a grievance and received an unsatisfactory response and he appealed through step-3, which was denied.

On August 15, 2016, Correctional Officer Grear confiscated Volume 2 of Lawrence Buchard's "The Covenant Heritage Series" from Inmate Eddie Money. Plaintiff informed Defendant Grear that he had loaned the book to Inmate Money as authorized by DPS policy. However, Grear said the book was Aryan Brotherhood material and therefore contraband. The book is religious regarding his ancestral religious practice and does not contain any gang-related subject-matter. Confiscation was the sole product of Grear's hatred of Plaintiff because of his race and ancestral religion and tries to use the security policies to punish Plaintiff. Plaintiff had received the book while at Avery C.I through proper mailroom screening. It was also inspected upon his arrival at Mountain View C.I., and he had it for over a year at Mountain View C.I. where it was inspected repeatedly without incident. Plaintiff was allowed to receive Volumes 4 and 5 of the

book. Plaintiff filed a grievance September 7, 2016, received an unsatisfactory response, and appealed through step-3 which was denied.

Plaintiff's incoming correspondences with Ed Sommerville suddenly stopped while Plaintiff was housed at Mountain View C.I., without notice. Plaintiff came to suspect that Defendant Ollis was responsible. This suspicion was confirmed on June 6, 2016, when Plaintiff found out that Sommerville's correspondences had been returned to him by mailroom staff. On July 11, 2016, Plaintiff wrote to Ollis on a request form and asked her to explain why the religious and political articles had been returned without notice or due process procedures, which are mandatory. On July 13, 2016, Defendant Ollis rubber stamped the request, saying the mailings had been returned due to absence of prisoner number in the address, which is untrue. On July 15, 2016, Plaintiff wrote to Defendant Perry informing him of Defendant Ollis' abuses but he did not respond or take any remedial action, which shows deliberate indifference. On October 22, 2016, after Plaintiff was transferred to Craggy C.I., he received two letters from Sommerville informing another Mountain View C.I. inmate of his futile attempts to mail religious and political printouts to Plaintiff. Plaintiff filed another grievance on October 22, 2016, which was returned without processing as untimely.

Plaintiff began studying Christian literature in 2001, received "Theophany" in 2004 which altered the course of his life, was invited to enroll in a "prototypical Seminary Extension Program" in 2007, and in 2009, received ordination from the Ministerial Seminary of America, adopted a "Christian identity," and began incorporating the "Hebrew Roots Movement" into his belief system, in May 2017 he was given the opportunity to prepare lesson plans and conduct weekly Sabbath services, and in 2018, he became the first officially designated "faith helper" in the Western District of North Carolina. (Doc. No. 16 at 14-16, 22). Yaweh grants his chosen people

who make the study of scripture the primary focus of their daily lives. (Doc. No. 16 at 18). Plaintiff's ability to perform these "divinely assigned duties" is measured by the amount of "curricular information that he is allowed to access, research, and assimilate in the advancement of his own spiritual maturation…." (Doc. No. 16 at 18). When the sources of information diminish, the practice of his religion is diminished. The confiscated material does not advocate violence and no rational relationship between stopping incoming religious publications and a compelling government interest, which has substantially burdened his religious practice. (Doc. No. 16 at 20).

Plaintiff requested judicial notice of the absence of hate, violence, white supremacist, racism, anti-Semitism, domestic terrorism, criminal activity from his beliefs, and that the Defendants' grievance responses are silent regarding a compelling government interest.

Plaintiff requested costs, injunctive relief, and "all punitive or remedial relief this court deems appropriate." (Doc. No. 16 at 29).

(2)  **Defendants' Motion for Summary Judgment** (Doc. No. 33)

Defendants argue that Plaintiff has failed to demonstrate the existence of a genuinely disputed material fact that the conduct he complains of is substantially burdensome to the exercise of his religion. The policy at issue placed restrictions on religious exercise and made it more difficult but did not pressure Plaintiff to violate or abandon the precepts of his religion. Plaintiff admits that he had access to other volumes of the legal materials to study his faith. Further, the publication and mail policies at issue are valid because they are reasonably related to the legitimate penological interests of controlling contraband and security problems. Plaintiff has also provided no genuine issue of material fact to show that Defendants acted with the requisite intent.

Plaintiff cannot proceed on claims against Defendant Perry on the theory of *respondeat superior* because there is no such liability under § 1983. He cannot proceed against Defendants Perry or Slagle on the theory of supervisory liability because the allegations fail to show that either of these Defendants had knowledge of a pervasive or unreasonable risk of constitutional injury to Plaintiff.

Plaintiff cannot recover monetary damages from Defendants in their official capacities because they are barred by the Eleventh Amendment and Defendants are entitled to qualified immunity from any claims for monetary damages in their individual capacities because their conduct was neutral and rational. Further, Plaintiff has not demonstrated any compensable damages for the alleged violation of his First Amendment rights aside from possibly asserting emotional distress or mental anguish and are not reasonably quantifiable.

**(3)**     **Plaintiff's Response** (Doc. No. 37)

The Court issued an Order pursuant to <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975), on April 26, 2019 informing Plaintiff of the legal standards applicable to summary judgment motions and ordering him to file a response within 14 days. (Doc. No. 36). The Court cautioned Plaintiff that "[f]ailure to to file a timely and persuasive response will likely lead to the relief that Defendant [Harwood] seeks." (Doc. No. 36 at 3).

Plaintiff file a Response to the Motion for Summary Judgment that attempted to state a claim for denial of access to the courts, which was denied, and was construed in part as a Motion for Extension of Time to Respond, which was granted until June 7, 2019. (Doc. Nos. 37, 38). That time limit has expired and Plaintiff has not filed any further response.[2]

---

[2] Plaintiff complains that he lacks the access to legal assistance and materials that would allow him to respond

**(4)**     **Evidence**[3]

    **(A)**     **Affidavit of Michael A. Slagle** (Doc. No. 35-1)

Defendant Slagle is the Superintendent of Mountain View C.I. He is familiar with NCDPS policies and procedures and is trained and experienced in the management of inmates like Plaintiff. As the Superintendent, Slagle has access to the Offender Population Unified System ("OPUS"), an electronic database containing comprehensive inmate records as well as NCDPS policies and procedures, Mountain View Standard Operating Procedure ("SOP") and documents related to the religious services and practices at Mountain View.

Defendant Slagle searched his records and found a letter from Plaintiff dated December 9, 2016; he did not find any correspondence from Plaintiff dated June 26, 2016. Anytime Slagle receives correspondence from an offender he takes it seriously and either investigates it, provides a response, or forwards it to the appropriate section for review and response. He does not ignore or dispose of any offender correspondence directed to him.

While reviewing Plaintiff's records, he reviewed documents that show Plaintiff appealed the decision to reject publications that were sent to him from Faith Baptist Church because they did not meet the guidelines to be considered approved from a legitimate marketer and/or distributor. Plaintiff's appeal was forwarded to the Inmate Publication Review Committee which reviewed the publications and determined that the source of the publications/materials was not a

---

to the Motion for Summary Judgment. The Court rejects this excuse for failing to respond. Plaintiff was informed of the applicable legal standard and of his obligation to "set forth specific facts showing that there is a genuine issue for trial…" in the <u>Roseboro</u> Order and was granted an extension of time to respond. (Doc. No. 36 at 2). Plaintiff has failed to explain how the alleged lack of access to legal assistance or materials prevented him from presenting evidence, including affidavits, to show there is a genuine <u>factual</u> issue for trial.

    [3] This section is not exhaustive.

legitimate publisher or distributor of publication material. Plaintiff chose to destroy the publications on August 2, 2016.

NCDPS policy provides procedures for how offenders confined at facilities such as Mountain View can receive and possess publications that include hardback and paperback books, newspapers, magazines, newsletters, and vendor catalogues. The NCDPS publication policy is "necessary to control security problems caused when contraband such as drugs, weapons, money, and tools that can be used to effect an escape are smuggled in books, magazines, and newspapers from unvetted sources or visitors." (Doc. No. 35-1 at 3). These searches are done to "reduce and prevent the incidents of contraband, to include drugs and weapons, which compromise the safety of the inmate and officers in the facility. (Doc. No. 35-1 at 3-4).

Offenders at Mountain View receive large quantities of mail on a weekly basis for the 908 offenders housed there. It is estimated that thousands of pieces of mail are received on a weekly basis. All incoming mail is searched per policy and staff find contraband in the mail frequently consisting of items such as drugs, tobacco, and Security Risk Group paraphernalia. Recently, staff found a large quantity of drugs coming through the mail disguised as religious material from a church, "showing the need for a strong policy regarding who and where mail and publications can be received from." (Doc. No. 35-1 at 4).

As Superintendent, Slagle is responsible for developing and implementing a facility contraband control procedure consistent with NCDPS Contraband Control Policy (Exhibit D). (Doc. No. 35-1 at 4). Mountain View's SOP regarding prisoner personal property includes rules

related to religious materials and unauthorized property or contraband (Exhibit E) and a policy on religious activities that includes rules related to religious items and practices (Exhibit F).[4]

NCDPS policies and procedures and Mountain View SOPs related to inmate mail privileges, receipt and possession of publications, contraband control, and the possession of religious materials or items "were not promulgated with any intent to discriminate against Plaintiff or his religious faith, but are necessary to maintain the safety of the inmates and officers in the facility." (Doc. No. 35-1 at 5). Slagle denies that, in performing his duties as the Superintendent at Mountain View, that he "violated any rights secured to Plaintiff under the laws of the State of North Carolina or the Constitution and laws of the United States." (Id.).

**(B)** **Affidavit of Isaac Grear** (Doc. No. 35-2)

Defendant Grear is a Correctional Officer at Mountain View. He is familiar with the policies and procedures of NCDPS and is trained and experienced in the management of inmates like Plaintiff.

As part of his duties as Correctional Officer, Grear regularly conducts searches of inmate property and supervised searches. These searches are done "to reduce and prevent the incidents of contraband, to include drugs and weapons, which compromise the safety of the inmates and officers in the facility." (Doc. No. 35-2 at 2).

Defendant Grear did confiscate a book from Inmate Money that, to Grear's knowledge, was not approved religious property. At the time Grear confiscated the book that was in Inmate Money's possession, it was Grear's opinion "based on [his] training and experience as a

_____

[4] The Court takes judicial notice of NCDPS Policy & Procedures and of Mountain View SOP which will not be separately summarized in this Order. See Fed. R. Ev. 201.

correctional officer that the book mirrored white supremacy materials." (Doc. No. 35-2 at 2). Therefore, pursuant to his training regarding unauthorized property that he suspected may be contraband, he confiscated the book and turned it in to Mountain View's facility intelligence officer for his review and determination if the book was a security risk. Defendant Grear recalls that he was approached by Plaintiff, "an associated gang member," who told Grear that the book was actually his. (Doc. No. 35-2 at 2). Because Plaintiff was designated as a possible gang member, Grear informed him that the book was submitted to the facility's intelligence officer and that he would pass on a note to the officer that the book was Plaintiff's. Grear is not aware of the outcome of the facility intelligence officer's investigation into the matter.

Defendant Grear does not draft policies or create them and cannot modify the policies of NCDPS or Mountain View. It is his role to implement the policies of NCDPS and Mountain View.

Defendant Grear confiscated the book he found in Inmate Money's possession because, to his knowledge and experience, it may have been contraband as defined in NCDPS and Mountain View policies. Defendant Grear "was not angry at Plaintiff, and in performing [his] duties [he] was not acting out of spite or malice." (Doc. No. 35-2 at 3). Defendant Grear performed his duties consistent with NCDPS and Mountain View policies. He "did not act with any intent to discriminate against Plaintiff either because of his race or religious faith." (Id.). Defendant Grear "den[ies] that in performing [his] duties" as a Correctional Officer at Mountain View, that he "violated any rights secured to Plaintiff under the laws of the State of North Carolina or the Constitution and laws of the United States." (Id.).

**(C)** **Affidavit of Lynn Ollis** (Doc. No. 35-3)

Defendant Ollis is Accounting Clerk I/ Mailroom Processing Assistant at Mountain View. As part of the duties as Mailroom Processing Assistant, Defendant Ollis regularly conducts the initial screening of incoming publications for compliance with NCDPS Policy & Procedures Manual, Chapter D, § .0100 regarding Publications Received/Possessed by Inmates. The Policy provides that, prior to the distribution of a publication, including hardback and paperback books, newspapers, magazines, newsletters, and vendor catalogues, initial screening is performed and then the publication is forwarded to the Warden/Superintendent or Deputy/Assistant Superintendent for the purpose of disapproving receipt or possession of a publication by an inmate. These searches are done "in order to reduce and prevent the incidents of contraband, to include drugs and weapons, which compromise the safety of the inmates and officers in the facility." (Doc. No. 35-3 at 2).

Defendant Ollis does not draft policies or create them and cannot modify the policies of NCDPS or Mountain View, but rather, implements the policies of NCDPS and Mountain View.

Mountain View is a medium custody facility. Plaintiff received publications that were sent to him from Faith Baptist Church, which "did not meet the guidelines to be considered approved from a source that is a legitimate marketer and/or distributor of published material, so the publications were rejected." (Doc. No. 35-3 at 2). The Faith Baptist Church does not meet the criteria of a "publisher," which is defined to include "legitimate wholesale marketers and distribution centers for published material" and includes "established retailers (Barnes & Noble, Borders, *etc*.) if selling published material is part of their business." (Doc. No. 35-3 at 2-3) (quoting NCDPS Policy & Procedure § .0101(a) and § .0109(f)(O)).

Plaintiff appealed the decision to reject these publications and his appeal was forwarded to the Inmate Publication Review Committee which reviewed the publications and determined that

the source of the publication/materials is not a legitimate publisher or distributor of publication material. Plaintiff chose to destroy the materials on August 2, 2016.

Defendant Ollis performed the duties consistent with NCDPS and Mountain View policies and "did not act with any intent to discriminate against Plaintiff because of his religious faith." (Doc. No. 35-3 at 3). Defendant "den[ies] that in performing [the] duties [of] a Mailroom Processing Assistant at Mountain View, [Ollis] violated any rights secured to Plaintiff under the laws of the State of North Carolina or the Constitution and laws of the United States." (Id.).

**(D)** **OPUS Online** (Doc. No. 35-2 at 13)

The Offender Gang Information screen shows that Plaintiff is SRG associate as of August 8, 2007.

**(E)** **Letter to Warden/Superintendent** (Doc. No. 35-3 at 39)

The Letter to Defendant Slagle from the Publication Committee on July 26, 2016 regarding the Return of Publication/Material Confiscated, states "The Publication Review Committee has completed a review of the publication(s). Below is a list of publication(s) being returned to your facility… Inmate Name Jimmy Roberts … Publication Title Faith Baptist Church… Final Action by PRC DISAPPROVAL."

**(F)** **Letter to Inmate** (Doc. No. 35-3 at 36-39)

The Letter to Plaintiff from the Chairperson of the Publication Review Committee on July 29, 2016 regarding "Your Appeal of Publication Source Listed Below," states "The disapproval of Faith Baptist Church 16800 Sunset Dr. Houston, MO 65483 as the source of your publication material has been reviewed. It has been determined that the source of your publication/material is

not a legitimate publisher or distributor of publication material and/or the source is in conflict with your custody level; therefore, you cannot receive the publication/material. Specifically, you are denied receipt of the publication/material due to the violation of Prison Policy Chapter D, Section .0109(f) Code (O), as described below… Source that is not a legitimate marketer, and/or distributor of published material." "Destroyed" signed by Plaintiff, August 2, 2016.

## II.     LEGAL STANDARDS

### (1)     <u>Summary Judgment</u>

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fec. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. <u>Id.</u>

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." <u>Id.</u> at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. <u>Id.</u> at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party."

Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). As a general rule, when one party files a motion for summary judgment, the non-movant cannot merely rely on matters pleaded in the complaint, but must, by factual affidavit or the like, respond to the motion. Celotex, 477 U.S. at 324; Kipps v. Ewell, 538 F.2d 564, 566 (4th Cir. 1976); Fed.R.Civ.P. 56(e).

A verified complaint is the equivalent of an opposing affidavit for summary judgment purposes when the allegations are based on personal knowledge. Davis v. Zahradnick, 600 F.2d 458, 459–60 (4th Cir.1979) (holding that the factual allegations contained in a verified complaint establish a prima facie case under 42 U.S.C. § 1983, so as to preclude summary judgment). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'" Smith v. Ozmint, 578 F.3d 246, 254 (4th Cir. 2009) (citing Scott v. Harris, 550 U.S. 372, 380 (2007)).

## (2) **First Amendment**

The First Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech…." U.S. Const. Amend I. The First Amendment applies to the states through the Fourteenth Amendment.

See Everson v. Bd. of Educ., 330 U.S. 1, 15 (1947). A prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. Procunier v. Martinez, 416 U.S. 396, 412 (1974), *limited by* Thornburgh v. Abbott, 490 U.S. 401 (1989); Pittman v. Hutto, 594 F.2d 407, 410 (4th Cir. 1979). When a prison restriction infringes upon an inmate's First Amendment rights, the alleged infringement "must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." Bell v. Wolfish, 441 U.S. 520, 547 (1979) (citing Jones v. N.C. Prisoners' Labor Union, 433 U.S. 119, 129 (1977)).

To state a free exercise claim under the First Amendment, a plaintiff must allege facts sufficient to show that he held a sincere religious belief, and that the official action or regulation substantially burdened his exercise of that belief. Hernandez v. Comm'r, 490 U.S. 680, 699 (1989). For government conduct to survive scrutiny under the Establishment Clause, "(1) it must have a secular purpose; (2) its principal or primary effect must neither advance nor inhibit religion; and (3) it must not foster an excessive government entanglement with religion." Buxton v. Kurtinitis, 862 F.3d 423, 432 (4th Cir. 2017) (citing Lemon v. Kurtzman, 403 U.S. 602, 612–13 (1971)); see also Madison v. Riter, 355 F.3d 310, 316 (4th Cir. 2003). A prison policy that substantially burdens an inmate's ability to practice his religion withstands a First Amendment challenge when it is "reasonably related to legitimate penological interests." O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987) (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)).

In deciding whether a defendant's actions can be sustained as reasonably related to legitimate penological interests, the court must consider: (1) whether there is a valid, rational connection between the action and the stated legitimate government interest; (2) whether there are alternative means of exercising the right; (3) whether accommodating the right will have an

adverse impact on guards, other inmates, and prison resources generally; and (4) the absence of ready alternatives). Substantial deference is accorded to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them. Turner, 482 U.S. at 89-91; Overton v. Bazzetta, 539 U.S. 126, 132 (2003). The burden is not on the State to prove the validity of prison regulations, but on the prisoner to disprove it. Id. Any regulation of speech must not be any more encompassing than necessary to further the penological interested involved. See Montcalm Publishing Corp. v. Beck, 80 F.3d 105, 108 (4th Cir. 1996) (citing Martinez, 416 U.S. at 424).

**(3)    RLUIPA**

RLUIPA provides, in part, that no government shall impose a "substantial burden" on the religious exercise of a person residing in or confined to an institution, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). "RLUIPA thus protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." Cutter v. Wilkinson, 544 U.S. 709, 721 (2005). A plaintiff bears the initial burden of showing that the challenged policy substantially burdens his exercise of his religion. See 42 U.S.C. § 2000cc-2(b); Holt v. Hobbs, 135 S. Ct. 853, 862 (2015). The statute defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A); Smith v. Ozmint, 578 F.3d 246, 251 (4th Cir. 2009). A "'substantial burden' is one that puts substantial pressure on an adherent to

modify his behavior and to violate his beliefs, [] or one that forces a person to choose between following the precepts of her religion and forfeiting governmental benefits, on the one hand, and abandoning one of the precepts of her religion on the other hand." Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006) (quotations, citation, and alterations omitted).

Once the inmate makes a *prima facie* showing, the burden shifts to the government to prove that "the burden in question is the least restrictive means of furthering a compelling governmental interest." Smith, 578 F.3d at 250. "'RLUIPA adopts a . . . strict scrutiny' standard." Couch v. Jabe, 679 F.3d 197, 203 (4th Cir. 2012) (quoting Lovelace, 472 F.3d at 198 n.8). Under RLUIPA, the court must give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Cutter, 544 U.S. at 723 (quotation omitted). "However, 'a court should not rubber stamp or mechanically accept the judgments of prison administrators.' . . . Rather, due deference will be afforded to those explanations that sufficiently 'take[] into account any institutional need to maintain good order, security, and discipline.'" Couch, 679 F.3d at 201 (quoting Lovelace, 472 F.3d at 190). Claims brought under RLUIPA are subject to a more demanding standard than claims under the First Amendment, that is, "strict scrutiny instead of reasonableness." See Lovelace, 472 F.3d at 187, 199 n.8 187 (Supreme Court jurisprudence interpreting the Free Exercise Clause provides guidance on what constitutes a substantial burden on religious exercise).

**(4)    Sovereign Immunity**

The Eleventh Amendment bars suits directly against a state or its agencies, unless the state has waived its immunity or Congress has exercised its power under § 5 of the Fourteenth Amendment to override that immunity. Will v. Michigan Dep't of State Police, 491 U.S. 58, 66

(1989). Congress has not imposed § 1983 liability upon states, and the state of North Carolina has done nothing to waive its immunity. Bright v. McClure, 865 F.2d 623, 626 (4th Cir. 1989) (citing McConnell v. Adams, 829 F.2d 1319, 1328 (4th Cir. 1987)).

"[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity." Kentucky v. Graham, 473 U.S. 159, 166 (1985). Therefore, a lawsuit against an officer in his official capacity is, in substance, a claim against the governmental entity and should be subject to the same analysis. See Almone v. City of Long Beach, 478 F.3d 100, 106 (2d Cir. 2007); see Hutto v. S.C. Retirement Sys., 773 F.3d 536, 549 (4th Cir. 2014) (State officials sued in their official capacities for retrospective money damages have the same sovereign immunity accorded to the State).

**(5)      Qualified Immunity**

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). The existence of qualified immunity "generally turns on the 'objective reasonableness' of the actions" without regard to the knowledge or subjective intent of the particular official. Am. Civil Libs. Union of Md., Inc. v. Wicomico County, Md., 999 F.2d 780, 784 (4th Cir. 1993) (quoting Anderson v. Creighton, 483 U.S. 635, 639, 641 (1987)) (internal citations omitted).

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims by determining whether: (1) the facts that a plaintiff has alleged or shown make out a violation of a constitutional right; and (2) the right at issue was "clearly established" at the time of defendant's alleged misconduct. While the sequence of the steps set forth in Saucier is "often appropriate," it is not mandatory. Pearson, 555 U.S. at 236. Judges are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. Id.

To overcome the qualified immunity defense at the summary judgment stage, the plaintiff must have shown facts that make out a violation of a constitutional right, and the right at issue must have been "clearly established" at the time of the defendant's alleged misconduct. Thompson v. Commonweath of Va., 878 F.3d 89, 97 (4th Cir. 2017) (citing Pearson, 555 U.S. at 232). The analysis takes place against the backdrop of two dueling interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231.

To find a right is clearly established does not mean that "the exact conduct at issue [must] have been held unlawful for the law governing an officer's actions to be clearly established." Amaechi v. West, 237 F.3d 356, 362 (4th Cir. 2001). Rather, the court's analysis must take into consideration "not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." Id. at 362-63 (internal quotation omitted). The right at issue is "clearly established" for qualified immunity purposes if:

[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right. That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.

Anderson, 483 U.S. at 640 (citation omitted).

To determine if the right in question was clearly established, the court first looks to cases from the Supreme Court, the Fourth Circuit, or the highest court of the state in which the action arose. Owens ex rel. Owens v. Lott, 372 F.3d 267, 279 (4th Cir. 2004). In the absence of "directly on-point binding authority," courts may also consider whether "the right was clearly established based on general constitutional principles or a consensus of persuasive authority." Booker v. South Carolina Dep't of Corr., 855 F.3d 533, 543 (4th Cir. 2017); Owens, 372 F.3d at 279 ("the absence of controlling authority holding identical conduct unlawful does not guarantee qualified immunity."). Ordinarily, the unlawfulness of government conduct must be apparent in light of pre-existing law. White v. Pauly, 137 S.Ct. 548, 442 (2017). However, a "general constitutional rule … may apply with obvious clarity ... even though the very action in question has not previously been held unlawful. Hope v. Pelzer, 536 U.S. 730, 741 (2002) (citing United States v. Lanier, 520 U.S. 259, 271 (1997)). Therefore, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Id. at 741.

## III. DISCUSSION

### (1) First Amendment & RLUIPA

Plaintiff asserts that Defendants violated the First Amendment and RLUIPA by confiscating religious materials that were mailed to him. Defendants assert, and Plaintiff does not dispute, that Plaintiff's ability to exercise his religion was restricted but was not completely

foreclosed by NCPLS and Mountain View SOP policies and procedures, that Plaintiff was not pressured to alter or violate his religious beliefs, and that Plaintiff admitted that he had alternate means of practicing his religion. Therefore, Defendants did not substantially burden Plaintiff's religious exercise. Defendants further assert, and Plaintiff does not dispute, that the confiscations were pursuant to NCDPS and Mountain View SOP that are necessary for the safety and security of inmates and staff at Mountain View C.I., were not promulgated to intentionally discriminate against Plaintiff or his religious faith, are reasonably related to legitimate penological interests, and that Defendants Grear and Ollis' actions in implementing these policies were the least restrictive means of furthering a compelling governmental interest.

Defendants have presented evidence that Grear and Ollis were not involved in the creation or modification of the NCDPS Policy & Procedure or Mountain View SOP, and that none of the Defendants acted outside the NCDPS or Mountain View policies and practices. To the extent that Plaintiff attempts to rely on *respondeat superior* this is unavailing because there is no such liability under § 1983. Further, Plaintiff has not adequately alleged personal involvement by Defendants Perry and Slagle, nor has he demonstrated that they had knowledge of an unreasonable or pervasive risk of constitutional injury to Plaintiff that would impose supervisory liability on them.

Plaintiff has thus failed to demonstrate that a genuine dispute of material fact exists with regards to Defendants' alleged violation of his rights under the First Amendment and RLUIPA.

**(2)**     **Sovereign Immunity**

To the extent that Plaintiff seeks compensatory and punitive damages against Defendants in their official capacities, this is barred by sovereign immunity. See Almone, 478 F.3d at 106;

Hutto, 773 F.3d at 549. Therefore, Defendants' Motion for Summary Judgment is granted on that basis.

**(3)    Qualified Immunity**

Defendants argue that qualified immunity shields them from damages in their individual capacities because Plaintiff has not established a constitutional violation and their applications of NCDPS and Mountain View SOP policies and procedures were neutral and reasonable.

Defendants have submitted evidence, and Plaintiff does not dispute, that Plaintiff is a suspected SRG associate and that some of his mail from unapproved sources was confiscated and sent for review in the interest of institutional safety and security in accordance with NCDPS and Mountain View SOP policies and procedures. Plaintiff has failed to demonstrate that Defendants violated a clearly established constitutional right of which a reasonable person would have been aware. Therefore, Defendants are entitled to qualified immunity and Plaintiff is precluded from obtaining damages against Defendants in their individual capacities.

Plaintiff has failed to satisfy his burden on summary judgment and therefore Defendants' Motion for Summary Judgment will be granted.

**IV.    CONCLUSION**

Based on the foregoing, Defendants' Motion for Summary Judgment is granted and the Clerk of Court will be instructed to close this case.

**IT IS, THEREFORE, ORDERED** that:

1.  Defendants' Motion for Summary Judgment, (Doc. No. 33), is **GRANTED**.

2.  The Clerk of Court is instructed to close this case.

Signed: June 25, 2019

Frank D. Whitney
Chief United States District Judge